AO 91 (Rev. 11/11)   Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT

3/31/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ LM _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

April 1, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Mireya Ramos | ) | Case No.   5:21-mj-00229 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 2020 through January 2021___ in the county of ___San Bernardino___ in the ___Central___ District of ___Califorina___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18, United States Code, Sections 1040 and 1343 | Fraud in Connection with Emergency Benefits and Wire Fraud. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

/S/
*Complainant's signature*

Rocio Gonzalez-USPIS-Postal Inspector
*Printed name and title*

Sworn and attested to before me via telephone.

Date: ___April 1, 2021___

*Judge's signature*

City and state: ___Riverside, CA___

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

*AUSA:* Byron R. Tuyay

**AFFIDAVIT**

I, Rocio Gonzalez, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Postal Inspector ("PI") with United States Postal Inspection Service ("USPIS") and have served in this capacity for 14 years.  I am presently assigned to the External Crimes Team in the San Bernardino Domicile of the Los Angeles Division.  My responsibilities as a Postal Inspector include investigating unemployment insurance fraud, mail fraud, identity theft, crimes against the United States Postal Service ("USPS"), crimes related to the misuse and attack of the mail system, and assaults and threats against USPS employees.  I am a graduate of the USPIS Career Development Unit (CDU) in Potomac, Maryland where I completed the Postal Inspector Basic Training.  As part of the 16-week residential training provided at the USPIS CDU, I successfully completed mail fraud courses detailing how mail thieves steal in various ways in order to gain access to items such as checks, money orders, cash, and gift cards, as well as individuals' personal information, and use such information to commit bank fraud, check fraud, and access device fraud with credit cards and debit cards.  Due to my expertise in mail fraud investigations, I have served as a course instructor at the CDU and assisted in revising and updating the Mail Fraud Basic Training Course.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.   I make this affidavit in support of a criminal complaint and arrest warrant against Mireya Ramos ("RAMOS") for violations of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>BACKGROUND INFORMATION ON UNEMPLOYMENT INSURANCE BENEFITS AND COVID-19-RELATED FRAUD</u>

### A.   Unemployment Benefits

4.   Since 1935, the DOL's UI program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own.  This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while the worker seeks employment.  UI beneficiaries who meet the requirements of the applicable state law are eligible for this temporary financial assistance.  Each state administers a separate UI program within the guidelines established by federal law.  In the state of California, the EDD administers the UI

2

program for residents and others physically performing work
activities in California.

5.   Generally speaking, regular UI claimants must be:
(1) unemployed through no fault of their own; (2) able and
available for work; (3) willing to accept suitable work; and
(4) actively seeking work.

**B.   PUA Under the CARES Act**

6.   On March 13, 2020, the President of the United States
declared the COVID-19 pandemic an emergency under the Robert T.
Stafford Disaster Relief and Emergency Assistance Act.  On March
27, 2020, the CARES Act was enacted to provide emergency
assistance and health care response for individuals, families,
and businesses affected by the COVID-19 pandemic.  The CARES Act
included, among others, the establishment of (1) PUA benefits to
provide financial assistance to individuals who are out of work
due to the pandemic, including those who do not usually qualify
for regular state UI such as self-employed, contract, and "gig
workers," (2) the Pandemic Emergency Unemployment Compensation
("PEUC") benefit, a 13-week benefit extension for people who
have used all benefits available in their regular UI claim, and
(3) the Pandemic Additional Compensation ("PAC") benefit, an
additional $600 federal stimulus payment automatically added to
each week of benefits received between March 29, 2020 and July
25, 2020.

7.   On August 8, 2020, after Federal Pandemic Unemployment
Compensation ("FPUC") expired, the President signed a
Presidential Memorandum authorizing the Federal Emergency

Management Agency ("FEMA") to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19.  The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds.  The period of assistance for LWAP is August 1, 2020 to December 27, 2020, or termination of the program, whichever is sooner.

8.   On December 27, 2020, the President signed into law the Consolidated Appropriations Act of 2021.  The guidance provided states with important information about several provisions of the law, including the extension of programs first authorized by the CARES Act earlier in the year, as well as the creation of a new UI benefit for "mixed earners."

9.   The law extended the PUA program created by the CARES Act, which provides UI benefits to gig workers and others not traditionally eligible for them.  Under the law, the end of the period of applicability for the PUA program extended to those weeks of unemployment ending on or before March 14, 2021.  In states where the week of unemployment ends on a Sunday, the last payable week of PUA was the week ending March 14, 2021 (March 13 if weeks of unemployment end on Saturday).  For individuals on PUA who have not exhausted their benefit eligibility of up to 50 weeks, the program also provided for continuing benefits for eligible individuals for weeks of unemployment through April 5,

2021.  The law also strengthened documentation requirements to ensure PUA program integrity.

10.  Additionally, FPUC, which expired July 31, 2020, was reauthorized and modified to provide $300 per week to supplement benefits for weeks of unemployment beginning after December 26, 2020 and ending on March 14, 2021, which was extended to September 4, 2021 by the COVID-19 Relief Bill.  FPUC was not payable with respect to any week during the gap in applicability, that is, weeks of unemployment ending after July 31, 2020, through weeks of unemployment ending on or before December 26, 2020.

11.  In addition, the time period for receiving the PEUC benefit was extended from December 27, 2020 to March 14, 2021, then through September 4, 2021, and the number of weeks that an individual could claim PEUC benefits was increased from 13 to 24 weeks.

12.  Prior to the enactment of the CARES Act, to be eligible for UI administered by the EDD, a person must have been employed and worked in California and received at least a certain amount of wages from an employer in the 18 months preceding his/her UI benefits claim.  Because of this requirement, self-employed workers, independent contractors, and employees with insufficient earnings were not eligible to receive regular UI benefits.

13.  The CARES Act established a new program -- PUA -- to provide unemployment benefits during the coronavirus pandemic to people who do not qualify for regular UI benefits including

business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic.  UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

14.  Under the PUA program, workers who are not eligible for regular UI benefits but are unemployed or partially unemployed for a COVID-19-related reason[1] permissible under federal law may receive unemployment benefits for up to 46 weeks.  Under the PEUC program, workers who are eligible for the regular UI benefits for up to 26 weeks may receive an additional 13 weeks of benefits for a total of 39 weeks, which was later increased to a total of 50 weeks.  Under the PAC program, for an individual receiving a regular UI benefit, a PUA benefit, or a PEUC benefit between March 29, 2020 and July 25, 2020, the EDD paid an additional $600 in CARES Act funds for each week of benefits.  Between December 26, 2020 and March 14, 2021, the

---

[1] COVID-19-related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

FPUC program provided an additional $300 per week for unemployment.  Examples of non-business-owner occupations that may qualify a person for PUA benefits include realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[2]

15.   The California EDD began accepting applications for PUA benefits on April 28, 2020.  Applications may be made online from any digital device, including smartphones, that connects to the Internet and is capable of accessing the EDD website's UI benefits page.  To make benefits available as quickly as possible, payments are issued in phases.  If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

Phase 1: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

Phase 2: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.

Phase 3: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

---

[2] To be eligible, such person must also not be participating in the UI Elective Coverage program. Under the provisions of the California UI Code, employers may elect UI and State Disability Insurance (SDI) or only Disability Insurance coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

16.   PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

17.   Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  The EDD may request documentation to provide proof of the stated income.[3]  If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using other resources available to the EDD in order to increase the PUA weekly benefit amount.

18.   Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, the EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the claim was submitted, the name of the person for whom the claim was filed, and the IP address of the computer, or Internet Service Provider ("ISP") account, that was used to file the claim.

19.   A PUA claimant must answer various questions to establish eligibility for PUA benefits.  The claimant must provide name, social security number ("SSN"), and mailing

---

[3] In general, the EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

address.  The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.

20.  After it accepts a UI claim, including a claim submitted pursuant to the PUA program, the EDD typically deposits UI funds every two weeks to an EBP debit card administered by BofA, which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

21.  When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits.  The EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment certifications (Continued Claim Forms).[4]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

22.  At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of

---

[4] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

$450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

23.    The submission of the PUA claims cause mailings to the addresses provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.  The co-schemers and their associates use the EBP debit cards to withdraw the fraudulently obtained UI benefits by making cash withdrawals at Automated Teller Machines ("ATM") and point of sale purchases at merchants across the United States.

### C.    UI Benefit Fraud Schemes

24.    Based on my conversations with other law enforcement officers, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, among other indicia:

a.    Co-schemers commonly buy or outright steal the personally identifiable information ("PII") of other people to file for fraudulent UI benefits in the ID-theft victims' names and then collect the UI funds.  Co-schemers often buy PII from other fraudsters or from the Dark Web[5] (using cryptocurrency such as Bitcoin) and verify that the PII belongs to real persons by

---

[5] Dark Web is the set of web pages on the Internet that cannot be indexed by search engines, are not viewable in a standard web browser, require specific means (such as specialized software or network configuration) in order to access, and use encryption to provide anonymity and privacy for users.  Dark Web has become the Internet's black market in recent years where visitors can make illegal purchases of PII, guns, and drugs, and trade child pornography.

checking the PII at background check websites such as Beenverified, Spokeo, Intelius, and Whitepages.

b. Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers. Once the EBP debit cards arrive, co-schemers commonly withdraw UI benefits via ATMs or make POS purchases at merchants for goods and services.

c. Submitting multiple UI claims from the same IP address for multiple claimants. These claims are sometimes submitted on the same day close in time.

d. Failing to provide a phone number or provide a wrong number on multiple UI claims so it may be difficult to reach the identity holder.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   Summary of Probable Cause**

25. The U.S. Department of Labor, Office of Inspector General ("DOL-OIG"), California EDD, Federal Bureau of Investigation, Homeland Security Investigations, and USPIS are investigating a fraudulent scheme in which the perpetrators fraudulently apply for and obtain UI benefits under the PUA provision of the CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by COVID-19.

26. The investigation initially obtained evidence that at least 21 fraudulent UI claims were filed from RAMOS's residence

located on San Bernardino Avenue in Colton, California, asserting falsely that the named claimants were self-employed independent contractors who were negatively affected by the COVID-19 pandemic, triggering eligibility for UI benefits under the PUA provision of the CARES Act.  The UI claims submitted in furtherance of the scheme falsely reported income to EDD for the named claimants on their applications in order to receive UI benefits.

27.  The applications for the fraudulent UI claims asserted that the named claimants were entitled to UI benefits administered by EDD when, in fact, they were not.  The majority of claims were for inmates at California state correctional facilities, including Calipatria State Prison in Calipatria, California; California Substance Abuse Treatment Facility and State Prison, in Corcoran, California; California Medical Facility in Vacaville, California; California Institution for Men in Chino, California; and North Kern State Prison in Delano, California.  Due to their custody status, the inmates listed as named claimants were not eligible to apply UI benefits because they were not: (1) unemployed through no fault of their own; (2) able and available for work; and/or (3) actively seeking work.  These actions in concert were material false statements leading to the theft of federal funds.

28.  The fraudulent UI claims were submitted electronically using an IP address that was registered to RAMOS, also known as "Rireya Ramos" and as "Mireya Ayon," and RAMOS's residence.  The submission of the UI claims caused mailings to the addresses

provided on the claims, including mailings of EBP debit cards administered by BofA that are used to access the fraudulently obtained UI benefits.

29.  A federal search warrant was obtained in Case No. 5:21-MJ-53, approved by the Honorable Sheri Pym, United States Magistrate Judge, to search RAMOS's residence and executed on February 18, 2021.  During a Mirandized interview with law enforcement, RAMOS admitted to filing the UI claims online for approximately 37 applications for individuals she knew to be inmates.  She stated that she obtained the PII, along with all the required information to submit the PUA application online from her longtime boyfriend, Calipatria State Prison inmate David Ortiz.  Investigators found a notebook at RAMOS's residence which contained detailed profiles, including the PII, addresses, dates, and e-mail addresses matching approximately 37 fraudulent UI claims that were filed from the IP Address registered to RAMOS's residence.

30.  From June 2020 to January 2021, EDD paid out over $353,532 in UI benefits on approximately 37 fraudulent PUA claims RAMOS' filed with EDD.  RAMOS conspired with Ortiz, and others known and unknown, in this scheme to defraud the State of California.

B.    RAMOS's Scheme to Fraudulently Obtain UI Benefits

1.    <u>DOL-OIG Investigated Public Reports of Fraudulent
      UI Claims Filed Under California Inmates' Names</u>

31.   Based on my review of reports, conversations with
other law enforcement officers, and my own involvement in this
investigation, I know the following.

32.   On or about November 24, 2020, as reported in the
New York Times, a task force led by district attorneys in San
Diego and Fresno Counties sent a letter to California Governor
Gavin Newsom raising concerns about widespread fraudulent UI
claims being filed by inmates in California correctional
facilities.[6]  On December 1, 2020, as reported in the Los
Angeles Times, investigators with State of California
estimated that approximately $400 million had been disbursed
on approximately 21,000 suspected fraudulent UI claims filed
using the PII of California prison inmates.[7]

33.   Following these reports of fraudulent UI claims
using inmate information, DOL-OIG investigated potentially
fraudulent claims using California inmates' PII.
Specifically, DOL-OIG obtained from the California Department
of Corrections and Rehabilitation ("CDCR") the PII of inmates

---

[6] "Unemployment Scam Using Inmates' Names Cost California
Hundreds of Millions," N.Y. Times, Nov. 24, 2020, <u>available at</u>
<u>https://www.nytimes.com/2020/11/24/us/california-unemployment-</u>
<u>fraud-inmates.html</u>.

[7] "California's Prisoner Unemployment Fraud Now Estimated at
$400 Million, Officials Say," L.A. Times, Dec. 1, 2020,
<u>available at</u> <u>https://www.latimes.com/california/story/2020-12-</u>
<u>01/california-prisoner-unemployment-fraud-estimated-400-million</u>.

housed in CDCR facilities at least since 2018.  The inmates were those who, due to their incarceration, were ineligible for UI benefits under the EDD's requirements.  DOL-OIG cross-referenced the inmates' PII with the data automatically stored by DOL-OIG and EDD for each UI benefit claim submitted to EDD.  Through this process, DOL-OIG identified hundreds of UI claims submitted using CDCR inmates' PII.  After identifying the IP addresses used to submit the UI claims using inmates' PII, DOL-OIG identified instances of multiple UI benefit claims made (both using inmates' PII and non-inmates' PII) from the same IP addresses.  In some cases, DOL-OIG found that a single IP address had been used to file dozens of UI claims resulting in hundreds of thousands of dollars of UI benefit disbursements.  DOL-OIG then obtained from ISPs specific subscriber information for the IP addresses from which multiple UI benefits claims were filed using CDCR inmates' PII.

34.  In December 2020, I received information from DOL-OIG Special Agent Christina Wang regarding suspected fraudulent UI claims filed with EDD from an IP address originating in the Central District of California, and ending in  76.174.221.139 (the "Target IP Address").  Records obtained from DOL and EDD's databases reflect that the Target IP Address was used to file at least 21 fraudulent PUA claims with EDD between June 2020 and August 2020.  Of the twenty-one 21 UI claims, approximately 19 of the claims were for inmates incarcerated in California state prisons, including

Calipatria State Prison in Calipatria, California; California
Substance Abuse Treatment Facility and State Prison, in
Corcoran, California; California Medical Facility in
Vacaville, California; California Institution for Men in
Chino, California; and North Kern State Prison in Delano,
California.

     2.   **The UI Claims Were Fraudulent**

     35.   The UI benefits have become a prime target for fraud.
The 19 UI claims submitted for California state inmates were
fraudulent.   The inmates whose PII had been used in UI claims
were not eligible to receive UI benefits because they did not
meet EDD's eligibility requirements.   Those inmates were not:
(1) unemployed through no fault of their own; (2) able and
available for work; and/or (3) actively seeking work.

     36.   The remaining claims also had indicia of fraud.   Based
on my training and experience, I know that individuals scheming
to fraudulently obtain UI benefits generally follow recognizable
patterns, including the following, among others:

          a.   Using the identities of other people to file for
fraudulent UI benefits in the other persons' names and then
collecting the UI funds.   In some instances, the named claimants
are victims of identity theft; in other instances, the named
claimants have provided their personal identifying information
to the schemers and have agreed to pay the schemers a portion of
the fraudulent benefits that are obtained; in yet other
instances, the named claimants believe they may be entitled to
benefits but do not know that the schemers are reporting false

information to EDD to fraudulently increase the amount of the benefits claimed.

b.   Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  According to EDD records, 5 UI claims filed from the Target IP Address used claimants' mailing addresses from the "Parkplace" apartment complex located at 16193 H Street, Mojave, California (apartment numbers L137 and E213).  Six UI claims used listed mailboxes at two different commercial mail receiving agencies in Victorville, California.

c.   Submitting multiple UI claims from the same IP address for multiple claimants.  As described further below, all of the relevant fraudulent claims were submitted from the same Target IP Address associated with the RAMOS residence.

d.   Submitting claims close in time.  The majority of the 21 UI claims here were filed between June 2020 and August 2020 from the Target IP Address.

e.   Providing similar or identical identifying information across multiple different claim applications.  Here, approximately 16 of the claims asserted that the claimant was self-employed as a barber.  Additionally, all but two of the applications did not list a telephone number.  Fourteen of the UI claims were for inmates in custody at the Calipatria State Prison.  The 21 UI claims filed from the Target IP Address used 10 different physical mailing addresses, which were all located

in the High Desert area of Southern California.  Of the 10
mailing addresses used, 2 were for commercial mail receiving
agencies.  The UI claims submitted from the Target IP Address
used claimant-e-mail addresses that showed the following
similarities:

         i.  Three UI claims used e-mail addresses that
incorporated the terms "CHUNK…CHUNK…LIL50";

         ii. Two UI claims used e-mail addresses that
incorporated the term "BRAXON3D99";

         iii.  Two UI claims used e-mail addresses that
incorporated the term "GREENMACHINE…50."

      3.  **The Fraudulent Claims Were Connected to RAMOS and to
Her Residence**

    37.  Further investigation revealed that the fraudulent
claims made on behalf of inmates discussed above were connected
to RAMOS and her residence in the following ways:

        a.  Records obtained from Charter Communications,
Inc., the ISP, reflect that at the time the UI claims were
submitted online to EDD from the Target IP Address, the
subscriber for the Target IP Address was RAMOS.  The service
address for the Target IP address was RAMOS's residence.

        b.  I queried law enforcement databases and records
and determined that RAMOS is associated with a residence on San
Bernardino Avenue in Colton, California.  As discussed in
further detail below, on February 18, 2021, a federal search
warrant (Case No. 5:21-MJ-53) was executed at RAMOS's residence

on San Bernardino Avenue in Colton, California during which I confirmed that RAMOS lived at the residence with her children. .

    4.   **Sample of the Fraudulent Claims**

    38.   I reviewed a sampling of the 21 fraudulent UI claims discussed above, which were submitted to EDD between June 2020 and August 2020.

    39.   The table below sets forth a sample of the fraudulent claims for certain California state inmates:

| Claimant | Claim Date | Claimed Reason for Unemployment | Claimed Work Was Affected | Claimed Amount | Dates of Incarceration |
|---|---|---|---|---|---|
| David Ortiz | 06/16/20 | COVID-19 | Barber | Approved ($3,080) | 02/06/01-PRESENT |
| Chavncey Johnson | 06/23/20 | COVID-19 | Barber | Approved ($2,568) | 02/18/97-PRESENT |
| Davante Ray | 07/03/20 | COVID-19 | Barber | Approved ($1,656) | 03/29/16-PRESENT |
| Camerdn Brown | 07/13/20 | COVID-19 | Barber | Approved ($7,542) | 01/30/06-PRESENT |
| Robert Martin | 07/14/20 | COVID-19 | Barber | Approved ($8,290) | 07/18/19-PRESENT |
| Pedro Garcia Zepeda | 07/14/20 | COVID-19 | Barber | Approved ($8,290) | 10/17/06-PRESENT |

    40.   All 21 claims were electronically filed from the above-referenced IP address located at RAMOS's residence.

    41.   All 21 were filed using similar information, as follows:

        a.   All 21 claimants reported being unemployed because of a "disaster," namely COVID-19;

        b.   All 21 claimants selected the following self-attestation: "Your place of employment is closed as a direct result of the COVID-19 public health emergency";

c.    Sixteen UI claims submitted for inmates listed their occupation as being a "barber";

d.    All 21 claims used mailing addresses located within the High Desert of California.  Multiple UI claims used the same addresses as the claimant mailing address; and

e.    As noted above, multiple claims used claimant e-mail addresses that incorporated similar terms like, "chunk" "GREENMACHINE," and "LIL50."

42.  In addition, CDCR records show that RAMOS is an associate of inmate David Ortiz.  Specifically, CDCR records show that RAMOS visited Ortiz at Calipatria State Prison as recently as December 20, 2020.  RAMOS is listed as a friend of Ortiz in CDCR records and visited inmate Ortiz approximately 188 times since May 2014.  On CDCR visitation records RAMOS listed a date of birth as XX-XX-1978 and telephone number as (909) 275-XXXX.  This date of birth is the same listed on RAMOS's California DMV driver's license, which also show her residence on San Bernardino Avenue in Colton, California as her address.  Telephone number she provided, (909) 275-XXXX, matches the number listed for the Charter Communications account associated with the Target IP Address.

5.    **Federal Search Warrant of RAMOS's Residence**

43.  On February 5, 2021, I obtained a search warrant for RAMOS' residence located on San Bernardino Avenue in Colton, California.  The search warrant (5:21-MJ-53) was issued by the United States District Court for the Central District of

California and signed by the Honorable Sheri Pym, United States
Magistrate Judge.

44.  On February 18, 2021, U.S. Postal Inspectors and I
executed the search warrant at RAMOS's residence at
approximately 6:30 a.m.  I identified myself to RAMOS and
explained that we were executing a federal search warrant of
her residence.  While searching the residence we identified
the three other occupants as RAMOS's children.

45.  In RAMOS's two-bedroom apartment, Postal Inspectors
found, among other items seized as evidence, a notebook on a
nightstand in RAMOS's bedroom.  RAMOS stated that the
notebook belonged to her.  I quickly reviewed the notebook
and saw that it contained names, dates of birth, social
security numbers, mailing addresses, e-mail addresses, dates,
currency amounts, and detailed highlighted notes.  Some of
the profiles appeared to be flagged with different colored
Post-It flags.  I recognized most of the names in the
notebook as the inmate names used for the fraudulent PUA
claims filed from the Target IP Address.

46.  Investigators also found during the search the
following mail addressed to RAMOS at her residence on San
Bernardino Avenue in Colton, California:

a.    Three letters addressed from State of California
EDD to J.L., one undated letter and the other letters were dated
January 13, 2021, and January 15, 2021;

b.    A letter addressed from the Social Security Administration to D.P.B., containing a Social Security Card for D.P.B.;

c.    Two letters addressed from Bank of America to addressees Mireya RAMOS and D.O.P.B.;

d.    A letter addressed from Department of Treasury Internal Revenue Service to addressees Mireya RAMOS and David F Ortiz;

e.    A letter addressed from the White House to addressees RAMOS and David F Ortiz regarding their Economic Impact Payment dated April 15, 2020;

f.    A letter addressed from Bank of America to addressees RAMOS and G.R.

6.    **Interview With RAMOS**

47.    I interviewed RAMOS on February 18, 2021 with U.S. Postal Inspector Brad Barnes while agents executed a search warrant at RAMOS's apartment.  The interview started outside of RAMOS's apartment and continued in the living room of her apartment.  I read RAMOS her *Miranda* rights from an agency issued card.  RAMOS stated that she understood her rights and agreed to speak to us.  RAMOS then told us the following information, among other things:

a.    For the last two years, she and her daughters have been the only permanent occupants of the apartment.

b.    In 2019, she married D.P. (not the same person as David Ortiz), who lived at the apartment intermittently

between September and December 2019.  RAMOS and D.P. are no longer in a relationship.

c.    RAMOS's adult daughter has a boyfriend, J.L., who has stayed overnight at RAMOS's apartment and visited the apartment often.

d.    RAMOS has been employed at C.F. for the past two years.  RAMOS's working hours had been reduced due to COVID-19 but she later received a pay raise.  RAMOS's adult daughter works part-time at a hospital.  RAMOS and the adult daughter supplement their income by selling flowers and fruit arrangements on Instagram.

e.    RAMOS's current boyfriend is David Ortiz, a CDCR inmate.  She had pictures of Ortiz in her living room. Ortiz is serving a life sentence of imprisonment without parole at Calipatria State Prison.  RAMOS and Ortiz have dated on and off for seven years.  RAMOS met Ortiz through Ortiz's sister.

f.    RAMOS visited Ortiz regularly, but her visits have been restricted due to COVID-19.  RAMOS has not visited Ortiz in person since March 2020 but has seen him on video calls offered by CDCR.  RAMOS and Ortiz also write to each other. RAMOS sometimes communicates with Ortiz on the phone.

g.    When asked if she knew why USPIS was searching her apartment, RAMOS claimed that Ortiz had asked her to file UI claims on behalf of other individuals with their consent.  She denied being paid to submit the UI claims for other people.

h.    Sometime in 2020, Ortiz suggested that RAMOS file UI claims for Ortiz and other inmates.  RAMOS agreed to file the claims after Ortiz assured her that the claims were legitimate. Ortiz gave RAMOS the information required to file the UI claims for inmates, including their social security numbers, dates of birth, mailing addresses, and purported previous employment information.

i.    RAMOS claimed she did not receive EBP cards or mail from EDD at her residence because she used mailing addresses other than her own when filing UI claims for the inmates.  RAMOS told Ortiz that she did not wish to receive mail from EDD on behalf of the inmates for whom she filed UI claims.  RAMOS stated that she did not know who picked up the EBP benefit cards on behalf of inmates at the claimant addresses.

j.    RAMOS recorded the inmates' personal information in a notebook, which investigators found in RAMOS's bedroom. RAMOS made annotations in the notebook next to the inmate information that read, "Got Card!"  This note indicated that Ortiz had reported an EBP card had been received.  If a UI claim was disqualified, RAMOS sometimes marked in her notebook that she refiled the UI claim.  RAMOS maintained login information and passwords for all of the EDD claims she submitted.  She periodically checked the status of the UI claims.  RAMOS admitted to creating e-mail addresses for some of the UI claims.

7.   **Analysis of RAMOS's Notebook**

48.  I reviewed RAMOS's notebook seized from her bedroom and determined the following:

a.     The notebook included the names and personal identifying information for all 21 fraudulent UI claims filed using the Target IP address associated with RAMOS's residence. Specifically, the notebook listed names, dates of birth, social security numbers, addresses, dates, e-mail addresses, security questions and answers, passwords, and currency amounts shown as a total and others shown as weekly amounts.

b.     I identified an additional 16 names not previously identified in our investigation.  Thirteen of the 16 additional names were inmates currently in custody at the Calipatria State Prison and one inmate in custody at the California Substance Abuse Treatment Facility and State Prison, in Corcoran.

c.     I also found several pages in the notebook that appeared to summarize various e-mail accounts used for the fraudulent claims, including those mentioned above that used the terms "CHUNK…CHUNK…LIL50", "BRAXON3D99", and "GREENMACHINE…50."

d.     The notebook also contained pages which appeared to list all of the mailing addresses used to file the fraudulent UI claims and the different claimants' names.  In total, 11 addresses were listed.  A maximum of 4 claimant names were listed per address.  In some instances, a claimant name was listed under one address and the word "moved" was written next to the name.  I found that the claimant names which were designated as "moved" were written a second time under a different address.  A total of 38 claimant names were listed with the mailing addresses including those which were written twice.  The word "CARD" was

written next to about 21 of the 38 names.  There were some names elsewhere in the notebook which were not listed in this summary section of addresses in the notebook.

   e. The notebook also included handwritten calculations under a heading that read "19 cards."  The calculation shows 4,500 subtracted from 9,500.  This equation is consistent with the "P 500" next to some claimants' information representing that RAMOS had been paid $500 for each UI claim that she filed and for which an EBP was card received.  Nineteen multiplied by $500 equals $9,500.  Based on these notes and equation, I believe RAMOS tracked when EDD UI cards had been received (with the note "Got Card!") and highlighting the claimant in yellow.  RAMOS then wrote "P 500" and highlighted the claimant in blue to indicate that she had been paid $500 for that claim.  Furthermore, I believe that "19 cards" written above "9,500-4,500= 5,000" represents a running tally, at that time, of the money owed to RAMOS for UI claims that she had filed.  I did not find the "P 500" to be written in the notebook independent of the term "Got Card!"  The photographs below provide an example of RAMOS's notes:



8.   **Analysis of Bank of America Records**

49.   On March 3, 2021, I received records for 17 BofA accounts associated with the fraudulent UI claims filed from the Target IP Address associated with RAMOS' residence.  These accounts had received approximately $353,532 from EDD.  Approximately $329,621.75 of the funds had been debited by either purchases or ATM withdrawals.

50.   A sampling of BofA surveillance photos show several yet unidentified individuals, other than RAMOS, using the BofA EDD cards to make cash withdrawals from the various accounts.

## V.  <u>CONCLUSION</u>

For all the reasons described above, there is probable cause to believe that RAMOS has committed violations of Title 18, United States Code, Sections 1040 (Fraud in Connection with Emergency Benefits) and 1343 (Wire Fraud).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>1st</u> day of
April, 2021.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE